**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                                            Case No. 04-90035
                                                              HON. MARIANNE O. BATTANI
D-1 LORETTA REID,
D-2 VICTOR REID, JR., and
D-3 VICTOR REID, SR.


                Defendants.
_____/


**ORDER DENYING DEFENDANTS' MOTION TO DISMISS INDICTMENT**

Now before the Court is Defendants' Motion to Dismiss Indictment (Doc. # 10 ).  The

Court held a hearing on the motion on January 19, 2005, and took the matter under advisement.

The Court has reviewed the pleadings and, for the reasons that follow, DENIES Defendants'

motion.

**I.  INTRODUCTION**

Defendants are charged in a nine-count indictment with violations of 18 U.S.C. §

922(v)(1), which prohibits the possession and/or transfer of reconfigured semiautomatic assault

weapons.  In Count One, the conspiracy count, it is alleged that between July 1999, and

November 2001, while Defendants were doing business as Midwest Ordnance, a gun shop

located in Royal Oak, Michigan, they purchased Romanian SKS rifles from firearms

wholesalers, converted them to semiautomatic assault rifles, and sold them to the public at gun

shows.  The illegal reconfiguration involved replacing the original wooden stock with a folding

polymer stock with a fixed pistol grip, and replacing the fixed magazine with a detachable

magazine.

Counts Two through Eight charge the individual Defendants with possessing and transferring the illegally reconfigured rifles on specific dates.  Count Nine charges each Defendant with possessing three illegally reconfigured rifles found during the execution of a search warrant at their business on November 1, 2001.

## II.  ANALYSIS

In their motion for dismissal, Defendants advance several grounds in support of their position that the indictment must be dismissed.  Specifically, they allege that (1) the statute is void under the commerce clause; (2) the indictment provides inadequate notice and fails to state an offense; (3) the exemption from the assault weapon ban for retired law enforcement officers violates equal protection and is not severable from the general prohibition; (4) the SKS rifles were lawfully possessed on the date of the enactment of the statute, therefore under the grandfather clause any subsequent possession and/or transfer was lawful; and (5) the definition of assault weapon is unconstitutionally vague.  Each argument is addressed below.

### A.  Is the ban a valid exercise of Congressional power to regulate interstate commerce?

Defendants primarily rely on United States v. Lopez, 514 U.S. 549 (1995) (invalidating Gun Free School Zone Act), as the basis for their argument that the ban cannot be sustained under the commerce clause.   In Lopez, the Supreme Court held that 18 U.S.C. § 922(q) "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms. . . .  Possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce."  514 U.S. at 560, 565-66.  In its opinion, the Supreme Court articulated

2

three categories of activity that Congress may regulate under its commerce power.  First, Congress may regulate activities that use channels of interstate commerce. Second, Congress may regulate the instrumentalities of interstate commerce, or persons or things in interstate commerce, even if the threat may come only from intrastate activities.  Third, Congress may regulate activities having a substantial relation to interstate commerce.  Lopez, 514 U.S. at 558-59.

The argument raised by Defendants, that § 922(v)(1) violates the commerce clause, was rejected in Navegar, Inc. v. United States, 192 F.3d 1050, 1055 (D.C. Cir. 1999) (finding that the activities regulated by 922(v)(1), the manufacture, transfer and possession of semiautomatic assault weapons, fall squarely within category three of Lopez), cert. denied, 521 U.S. 816 (2000).  Admittedly, the Sixth Circuit has not ruled on a commerce clause challenge to the statutory provision before this Court; however, in United States v. Beuckelaere, 91 F.3d 781 (6th Cir. 1996), it rejected the defendant's argument that section 922(o), which prohibits the transfer or possession of machine guns, was unconstitutional.  The appellate court found that the ban fell within all three categories of Lopez; and, therefore, was a permissible exercise of authority under the commerce clause.

In light of Navegar, and persuasive authority from this Circuit, upholding the machine gun ban under 18 U.S.C. §922(o); the similarities between the machine gun ban and the semiautomatic assault weapons ban and how they relate to interstate commerce, the Court rejects Defendants' argument that Lopez requires the is Court to dismiss the indictment  Accordingly, the Court denies the motion to dismiss on this ground.

**B.  Does the indictment provide adequate notice and state an offense?**

Defendants assert that the indictment must be dismissed because it does not allege such characteristics as constitute a semiautomatic assault weapon.  The government's reference to Romanian SKS rifles does not inform Defendants if the rifles fall into one of the specific models identified in § 921(a)(30)(A) or one of the generic combinations specified in § 921(a)(30)(B).

Rule 7(c)(1), Fed.R.Crim.P., requires only that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1).  Its purpose is twofold:  (1) to assure that defendants are fairly informed of the charges against which they must defend so that they may prepare a defense, and (2) to permit them to plead double jeopardy upon any subsequent prosecution. Hamling v. United States, 418 U.S. 87, 117 (1974);  see  also 1 Charles Alan Wright, Federal Practice and Procedure §§ 123, 125 (3d ed. 1999). It is not necessary that an indictment recite the exact language of the statute or precisely track its language. United States v. Poole, 929 F.2d 1476, 1479 (10th Cir. 1991).

In this case, the indictment apprizes the Defendants that semiautomatic assault weapons are involved.  The Court places no import on the fact that the weapons alleged in the indictment do not correspond to any of the specific models listed in § 921(a)(30).  The weapons at issue here are alleged to be rifles; consequently, § 921 (a)(30)(B) governs.  It reads in relevant part:

> The term"semiautomatic assault weapon" means. . ."a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of –
>
> > (i) a folding or telescoping stock;
> > (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
> > (iii) a bayonet mount;
> > (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
> > (v) a grenade launcher. . . ."

4

Id.

The government intends to prove the definition applies to the weapons at issue in the indictment.  The indictment, as written, notifies Defendants of the crimes alleged and gives them a sufficient basis for preparing their defense.  In sum, it satisfies the twofold purpose.  Moreover, Defendants' argument fails to recognize that the language of Rule 7(c)(1) does not require each and every definition found in the criminal code to be incorporated in the indictment.  To hold otherwise, would nullify its broad language.  Therefore, the Court declines to dismiss the indictment on this ground.

### C.  Does the exemption for retired law enforcement officers violate equal protection?

Title 18 U.S.C. § 922(v)(4) provides an exception to the assault weapons ban for "the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement."  Defendants argue that the exemption violates equal protection and that because the provision is not severable, the statute must be found unconstitutional.

Pursuant to the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction, the equal protection of the laws."  "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  If legislation does not burden a fundamental right or target a suspect classification, it will withstand constitutional scrutiny, provided it bears a rational relationship to a legitimate state interest.  Vacco v. Quill, 521 U.S. 793, 797 (1997); Romer v. Evans, 517 U.S.

620, 631 (1996).

Defendants' attack on the constitutionality of this exemption is supported, in part, by a court of appeals decision reviewing a state law containing the same exemption. California enacted restrictions on the possession, use and transfer of semiautomatic weapons, which included a statutory exception allowing the possession of semiautomatic weapons by retired peace officers who acquired them from their employers at the time of their retirement. See Silveira v. Lockyer, 312 F.3d 1058 (9th Cir. 2002), cert. denied, 540 U.S. 1046 (2003). That exemption was challenged, and the Ninth Circuit Court of Appeals held that the exemption violated the equal protection clause.

> Initially, we observe that allowing residents of California to obtain assault weapons for purposes unrelated to law enforcement is wholly contrary to the legislature's stated reasons for enacting restrictions on assault weapons. As set forth more fully above, the legislature found that "the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens in this state. . . . In light of the unequivocal nature of the legislative findings, and the content of the legislative record, there is little doubt that any exception [] unrelated to effective law enforcement is directly contrary to the act's basic purpose of eliminating the availability of high-powered, military-style weapons and thereby protecting the people of California from the scourge of gun violence.

Id. at 1090.

The appellate court then searched for "any hypothetical rational basis for the exception, whether or not that reason is in the legislative record," and found none. Id. It observed that it was unable to "discern [a] legitimate state interest in permitting retired peace officers to possess and use for their personal pleasure military-style weapons. Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." Id. at 1091.

There is no dispute that the review here is limited to whether a rational basis for the

6

exemption exists.  The government asserts that a rational basis does exist.  In <u>United States v. Oliver</u>, 390 F.3d 482, 485 (6th Cir. 2003) (quoting H.R. Rep. No. 103-489), <u>vacated</u> and <u>remanded</u> (for further consideration in light of <u>United States  v. Booker</u>, 543 U.S. 1951 (2005)), 125 S.Ct. 1950 (2005), the Sixth Circuit recognized that the ban was enacted to "curb the threat posed by the growing number of criminals and mentally deranged individuals armed with semiautomatic assault weapons."  The exemption, according to the government, merely reflects that the receipt of a retirement gift of a semiautomatic weapons to a law enforcement officer upon his retirement does not put a weapon in the hands of those about whom Congress was concerned.  Nor does it contribute to the trafficking of these weapons.  <u>See</u> <u>Olympic Arms v. Buckles</u>, 301 F.2d 384, 386 (6th Cir. 2002) (quoting H.R. Rep. No. 90-1577) (the ban was enacted to "strengthen federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders).  Further, the government emphasizes that the exemption is limited inasmuch as the weapon must be received from the agency upon retirement.

The rationale advanced by the government is no more grounded in rationality than those rejected by the Ninth Circuit Court of Appeals.  Neither <u>Oliver</u> nor <u>Olympic Arms</u> assists in that regard.  If the purpose of the law is to keep assault weapons from criminals or mentally deranged individuals, than the exemption should be for all who fall outside those categories.  Similarly, if regulation is the purpose, there is no reason for exempting retirees from a particular profession. The Court agrees with the analysis in <u>Silveira</u>; there is no rational basis for the exception. Consequently, the Court directs its attention to whether the provision can be severed.

*Can the provision be severed?*

7

Defendants argue that the provision cannot be severed because the legislation lacks a severability clause, a fact that distinguishes the federal assault weapon ban from the state law addressed in <u>Silveira</u>.  Here there is no explicit severability provision.

The distinction is not dispositive:  Congressional silence does not create a presumption against severability.  <u>Alaska Airlines, Inc. v. Brock</u>, 480 U.S. 678, 686 (1987).  Moreover, in general, courts should "refrain from invalidating more of the statute than necessary." <u>Id.</u>, at 684.  The determination turns on an assessment of whether Congress would have enacted the provisions that remain constitutional absent the others.  <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172, 191 (1999).  The Court must determine whether the statute will function in the manner consistent with the intent of Congress after the unconstitutional provision have been severed. <u>Alaska</u> at 685.

Here, there is no contention that the general assault weapons ban is unconstitutional nor is there any argument before the Court that the type of weapons covered by the ban is irrational.  <u>Compare</u>, <u>Springfield Armory, Inc. v. City of Columbus</u>, 29 F.3d 250 (1994) (holding a ordinance provision defining prohibited weapons by brand name, but not including similar assault weapons of the same style, function or capability, was unconstitutionally vague).  The sole basis of the equal protection challenge is the law enforcement exemption.  The general assault weapons ban found in section 922 (v)(1) can function independently, and the slight expansion of the ban would not distort its purpose.  This fact distinguishes it from <u>Springfield Armory</u>, where in the court declined to sever the offending provision because excising the definition provision of the local assault weapons ordinance would render it even more irrational.  Therefore, the Court concludes the retired officers exemption should be severed, and the Court

8

denies Defendants' request to dismiss the indictment on this basis.

### D.  Are the SKS Rifles protected under the grandfather clause?

Defendants maintain the Romanian SKS rifles were assault weapons when they came into defendant's possession; therefore, they are grandfathered in.  Specifically, Defendants assert that the rifles, as originally configured, have the "ability to accept a detachable magazine," "a pistol grip that protrudes conspicuously beneath the action of the weapon," and a bayonet mount.  Thus, the rifles met the statutory definition.  See § 921(a)(30)(B).

The prohibition in § 922(v)(1) does not "apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed under Federal law on the date of the enactment of this subsection."  18 U.S.C. § 922(v)(2).  Accordingly, if the SKS rifles met the statutory definition of semiautomatic assault weapon when they came into Defendants' possession, and they were otherwise possessed lawfully under Federal law on the enactment date, there is no violation.

The government challenges Defendants' argument, claiming that Defendants did not possess the guns prior to the enactment of the statute and that Defendants modified lawful rifles.  According to the indictment, Defendants purchased the Romanian SKS rifles from Century Arms International ("CAI") and/or Centerfire Systems in 1999, several years after the date the ban was instituted.  Further, the original military configuration of the rifle included a fixed wooden stock, a fixed five-round magazine and no pistol grip.  The government asserts that the rifles were sold in their original military style configuration.

For Defendants to succeed on the issue of whether the Romanian SKS rifles in this case qualified as assault weapons as originally manufactured requires, they must show that the rifles

9

had the ability to accept a detachable managzine and at least two of the other characteristics specified in § 921(a)(30)(B).  The parties agree that the rifles met one of the criteria–they had bayonet mounts.  The parties disagree as to whether, when they came into Defendants' possession, they had the ability to accept a detachable magazine and whether the original pistol grip protruded conspicuously beneath the action of the weapon.

According to Defendants,  SKS rifles have a detachable magazine because one has only to pull the magazine catch and a major part of the magazine swings down and detaches from its normal position in the magazine well of the receiver.  Even if the Court were to accept Defendants' argument as to the nature of the magazine, they cannot show the SKS rifles are protected under the grandfather clause.  In their original state, the SKS rifles do not have pistol grips that protruded conspicuously beneath the action of the weapon.  The Court reaches this determination based upon Exhibit 1 of the government's response brief.  The photograph of an SKS rifle, as originally configured, shows a rifle with a bayonet mount, a wooden stock and nonprotruding pistol grip.  Accordingly, the SKS, as originally configured, do not fall within the definition of assault weapon and were not lawfully possessed under Federal law on the date of the enactment.  Later alterations transfigured the rifles into assault weapons, and Defendants' request for dismissal of the indictment on this ground fails.

**E.  Is the definition of assault weapon unconstitutionally vague?**

Defendants argue that the phrase "protrudes conspicuously" used in section 921(a)(30)(B)(ii) is unconstitutionally vague as applied to the weapons they possessed. No dimensions are included as to inform what is deemed conspicuous.  Moreover, Defendants claim that virtually every modern rifle has a pistol grip that is easily seen.

10

"The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." United States v. Harriss, 347 U.S. 612, 617 (1954). The principle underlying the doctrine is that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." Id.

In Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681 (2d Cir. 1996), the Second Circuit held that similar language used in a local assault weapon ban was sufficient for give notice of what was prohibited.  The appellate court noted:

> As is made plain in the [Report and Recommendation fo the ATF Working Group on the Importability of Certain Semiautomatic Weapon (1989) ("ATF Report")] prepared in connection with that agency's ban on the importation of assault weapons, most sporting firearms "employ a more traditional pistol grip *built into the wrist of the stock* of the firearm."  ATF Report at 7 (emphasis added).  By contrast, "[t]he vast majority of military firearms employ a well-defined pistol grip that *protrudes conspicuously beneath the action of the weapon*."  Id. (emphasis added).  The latter design is favored in military weapon because it aids in "one-handed firing" at hip level, a technique sometimes required in combat, but "not usually employed in hunting or competitive target competitions" where a firearm is held with two hands and fired at shoulder level.  Id.  Although plaintiffs argue that any rifle can be shot with one hand and at hip level, that is hardly the point.  This factor aims to identify those rifles whose pistol grips are designed to make such spray firing form the hip particularly easy.  Even a cursory review of the photographs submitted by the parties demonstrates that a sufficient number of assault rifles are so plainly equipped with grips that protrude conspicuously that it cannot be said that the factor is vague in all applications.  In deed, the court notes that Congress itself chose the very same formulation as a defining term for assault weapon in federal legislation.  18 U.S.C. § 921(a)(30)(B)(ii).

Id.  at 684.  A pistol grip refers to the portion of the stock held by the rearward hand.  All pistol grips protrude beneath the action of the weapon.  The rifles at issue here have grips that run perpendicular and beneath the stock and action of the rifle and are large enough to be held in one hand.  A person of ordinary intelligence would recognize that the pistol grips protruded

11

conspicuously beneath the action of the weapon.

Accordingly, the Court concludes that the entire definition of semiautomatic assault weapon provided adequate notice that possession of the Romanian SKS rifles, as modified, was prohibited.   Defendants' argument that the indictment must be dismissed on this ground is baseless.

## III.  CONCLUSION

For the reasons stated above, Defendants' motion is DENIED.

SO ORDERED.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATED: June 17, 2005

**CERTIFICATE OF SERVICE**

Copies of this Order were mailed to Steven Fishman, Joel J Kirkpatrick, Robert M. Morgan and Frances Lee Carlson on this date by ordinary mail and/or electronic filing.

s/Bernadette M. Thebolt
DEPUTY CLERK